IN THE UNITED STATES DISTRICT COURT

NORTHERN DIVISION, DISTRICT OF UTAH

| | | |
|---|---|---|
| RICHARD A. BROWN, | : | Case No. 1:02-CV-00088 JTG |
| Plaintiff, | : | |
| vs. | : | **REPORT AND RECOMMENDATION** |
| JO ANNE B. BARNHART, Commissioner of Social Security, | : | District Judge J. Thomas Greene<br>Magistrate Judge David Nuffer |
| Defendant. | | |

Plaintiff Richard A. Brown filed this action seeking judicial review of a final decision of the Commissioner denying his application for Disability Insurance Benefits (DIB) under the Social Security Act.[1] This case was referred to the undersigned under 28 U.S.C. §636(b)(1)(B). The undersigned was directed to manage the case, receive all motions, hear oral arguments, conduct evidentiary hearings as deemed appropriate and submit to the District Judge a report and recommendation for the proper resolution of dispositive matters presented.

---

[1] 42 U.S.C. §§ 401-433.

The magistrate judge has carefully reviewed the pleadings and finds oral argument would not be helpful. For the reasons set forth below, the magistrate judge recommends that the case be remanded to the Commissioner for further proceedings.

## STANDARD OF REVIEW

Review of the Commissioner's decision is limited to determining whether substantial evidence in the record as a whole supports the factual findings, and whether the correct legal standards were applied.[2] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion".[3] Evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.[4] The Court may neither re-weigh the evidence nor substitute its discretion for that of the Commissioner.[5] Where the evidence as a whole can support either the Agency's decision or an award of benefits, the Agency's decision must be affirmed.[6] However, the Commissioner's decision is subject to reversal if the incorrect legal standards were applied.[7]

---

[2] See *Castellano v. Secretary of Health & Human Services,* 26 F.3d 1027, 1028 (10th Cir. 1992); *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1497-98 (10 Cir. 1992); 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U. S. 389, 402 (1981).

[3] See *Hamilton*, 961 F.2d at 1498.

[4] See *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992).

[5] See *Hinkle v. Apfel*, 132 F.3d 1349, 1351 (10th Cir. 1997); *Kelly v. Chater*, 62 F.3d 335, 337 (10th Cir. 1995).

[6] See *Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990).

[7] *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988).

PROCEDURAL HISTORY

Plaintiff, Richard A. Brown, pursuant to 42 U.S.C. § 405(g), seeks judicial review of the decision of the Commissioner of Social Security denying his claims for disability insurance benefits (DIB) under Title II, and supplemental security income benefits (SSI)[8] under Title XVI, of the Social Security Act, 42 U.S.C. § 401-433, 1381-1383f, respectively.

Plaintiff applied for DIB and SSI on February 29, 2000, alleging an inability to work since March 30, 1999, as a result of residual effects of schizophrenia. (See Tr. 79-81, 86, 94, 110.) After his claim was denied at the initial (August 2000) and reconsideration (January 2001) levels of administrative review (See Tr. 62, 63, 66-68, 70-72), a hearing before an Administrative Law Judge (ALJ) was held on August 23, 2001. (See Tr. 28-61.)

In his November 29, 2001 decision, the ALJ denied Plaintiff's claims, finding he was not disabled because he retained the residual functional capacity (RFC) to perform his past relevant work as an upholsterer's helper, an upholsterer, and an electronics assembler. (See Tr. 18, 19-20 (Findings 8, 9, 10.).) The Appeals Council denied Plaintiff's subsequent request for review (See Tr. 4-6) and the ALJ's November 29, 2001 decision became the Commissioner's "final decision" under 42 U.S.C. §405(g).

Plaintiff now brings the instant action, seeking judicial review of the Commissioner's decision.

STATEMENT OF FACTS

Plaintiff was 45 years old on the date he claimed he became disabled (on March 30, 1999) and 46 years old on the date of the Commissioner's "final decision." (See Tr. 10-20, 79.) He

---

[8] Plaintiff's SSI application was not included in the transcript.

graduated from high school and attended specialized training in upholstery. (See Tr. 34, 116.) He worked for nearly 20 years as an upholsterer or an upholsterer's helper and also an electronics assembler. (See Tr. 36-40, 83, 119-22, 123-30.) Plaintiff was divorced for many years and lived alone in a rented room. (See Tr. 33, 34, 79.) His source of support at the time of the hearing was General Assistance, public housing, and food stamps and he received medical treatment from "UMAP" and Weber Human Services. (See Tr. 34.) He testified he was disabled due to residual effects of schizophrenia, which include an inability to concentrate, auditory hallucinations, and dizziness. (See Tr. 40-45.) Plaintiff testified he had heard auditory hallucinations for as long as he could remember. (See Tr. 54.) He slept up to 12 hours per night, prepared his own meals, cleaned his room, walked quite a bit daily, visited his mother daily, visited a library and read several times daily, watched some television daily, hiked, occasionally visited his brother, rode a bike, and received visits from "some home teachers . . . once a month on Sunday." (See Tr. 49-54.)

  Plaintiff first presented to the Weber Human Services in December 1999, at which time a social worker diagnosed undifferentiated schizophrenia (See Tr. 172-74.) At that time, Plaintiff admitted he had a history of alcohol abuse. (See Tr. 167-70.) In January 2000, Plaintiff reported to Sandra Talley, a nurse practitioner with the Weber Human Service, that he had constant headaches and heard noises in his head. (See Tr. 163) Ms. Talley noted Plaintiff had poorly organized thoughts, a constricted affect, and disjointed speech, but he was fully oriented, clean, and appropriately dressed. (See Tr. 163-64.) She thought it necessary to rule out whether Plaintiff had a thought disorder and a seizure disorder. (See Tr. 164.) She prescribed Neurontin. (See Tr. 164.)

Marilyn Dippold, a nurse practitioner at the Health Clinics of Utah, treated Plaintiff from February through March 2000. (See Tr. 138-44.) On February 2, 2000, Plaintiff reported he had occasional headaches, a three year history of depression, and a "grinding" noise in his head prior to going to sleep, but stated medication decreased the noise level. (See Tr. 141, 142, 144.) He denied drug or alcohol use. (See Tr. 143.) Ms. Dippold noted Plaintiff had a normal physical examination and suspected Plaintiff had headaches and depression. (See Tr. 144.) On February 16, 2000, Ms. Dippold found Plaintiff was not in acute distress. (See Tr. 140.) She suspected Plaintiff had insomnia and paranoia; she added a prescription for Zyprexia. (See Tr. 140.) On March 1, 2000, Plaintiff reported he saw stars and clouds with increased exercise, but felt better overall since he began taking Zyprexia. (See Tr. 138.) Ms. Dippold suspected Plaintiff had tension headaches and possible residual effects of an old closed head injury; she referred Plaintiff for a neurological evaluation. (See Tr. 138.)

On February 25, 2000, Ms. Talley noted Plaintiff continued to demonstrate delusions and tangential thoughts. (See Tr. 162.) In March 2000, Ms. Talley noted that Plaintiff did "pretty well" on medication and received "some positive benefit" from it. (See Tr. 162.)

On March 13, 2000, Navin K. Varma, M.D., performed a neurological evaluation of Plaintiff. (See Tr. 134-35.) Plaintiff reported dizziness, fainting spells, insomnia, difficulty falling asleep, collapsing with loss of consciousness once every few years, inability to dream, waking up and biting his tongue, a feeling of being half awake and half asleep, waking up and seeing his dreams, falling off scaffolding in the past, and a history of a closed head injury. (See. Tr. 134.) He reported he had these symptoms for a "fairly significant period of time." (See Tr. 134.) Dr. Varma found Plaintiff had intact and fluid speech; normal muscle strength, tone, and

bulk; and intact sensation, reflexes, coordination, and gait. (See Tr. 134.) He suggested diagnostic testing. (See Tr. 134.)

On March 31, 2000, Ms. Talley reported Plaintiff did well on medication. (See Tr. 160.) In May 2000, Angela Keane, a nurse with the Weber Human Services, noted Plaintiff was "somewhat" dysphoric, but alert and oriented, coherent, reality-based, and without delusions or violent tendencies. (See Tr. 158.) In July 2000, Plaintiff admitted to Ms. Keane that he did not take the prescribed mental health medication. (See Tr. 156.) His thinking was "somewhat disorganized, scattered and tangential" and he was irritable. (See Tr. 156.) He reported feeling depressed, having difficulty with motivation, frequently napping, and having difficulty sleeping. (See Tr. 156.) Ms. Keane diagnosed chronic, undifferentiated schizophrenia and noted poor medical compliance. (See Tr. 156.)

In July 2000, Janet Burton completed a form that was filed in support of Plaintiff's DIB and SSI applications, stating Plaintiff attended to his personal needs independently, prepared and ate meals, shopping weekly, watched television several times per day, did chores, and walked for exercise. (See Tr. 103-07.)

Also in July 2000, Stanley Brown, Plaintiff's brother, completed a form that was filed in support of Plaintiff's DIB and SSI applications. (See Tr. 88-93.) He stated he sometimes saw Plaintiff once per month or less and Plaintiff's home was a mess; Plaintiff cared for himself independently, Plaintiff rode a bike for exercise; and Plaintiff drove a car. (See Tr. 90-91.) Mr. Brown stated that because of drug abuse, Plaintiff did not have a grip on reality and he had not changed in the last 20 years. (See Tr. 92.) He also stated Plaintiff was a good, hard worker when he wanted, but could not take direction or supervision. (See Tr. 92.)

On August 10, 2000, Craig K. Swaner, Ph.D., evaluated Plaintiff at the request of the State agency Disability Determination Services (DDS). (See Tr. 145-52.) Plaintiff rode his bicycle three miles to the evaluation; he was well groomed and exhibited adequate personal hygiene and grooming; he was independent in his basic self-help skills; he completed his activities of daily living on a regular basis, including managing his funds and doing his own house cleaning, cooking, grocery shopping, and laundry. (See Tr. 145.) Dr. Swaner found Plaintiff was cooperative; maintained eye contact; had a stable gait; and had no difficulties with motor coordination or motor mannerisms. (See Tr. 146.) Plaintiff reported he slept excessively and had schizophrenia. (See Tr. 146.) He was not socially active, he occasionally fixed dinner for his mother, he spent the majority of his time riding his bicycle, and he had a history of hearing noises, which medications helped. (See Tr. 147-48, 149.) Dr. Swaner found Plaintiff had a flat affect; a bland mood; appropriate reality testing; no gross confusion or disorientation; an adequate fund of general cultural information; good vocabulary skills; no difficulty tracking conversation; adequate calculation skills; and normal common sense reasoning skills, abstract reasoning skills, and attention and concentration. (See Tr. 148, 150.) He was capable of reading and interpreting a sentence, copying a complex diagram, completing a three-step command, following one-and two-step instructions, focusing, and staying on task. (See Tr. 148 150.) Dr. Swaner diagnosed schizophrenia, undifferentiated, with a current global assessment of functioning score (GAF) of 55.[9] (See Tr. 152.)

---

[9]A GAF between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, *Diagnostic and Statistical Manual-Test Revision* (DSM-IV-TR 2000), *available on* Teton Viewer Medical Reference (Fourth Quarter 2002) CD-ROM.

On August 14, 2000, Plaintiff reported to Ms. Keane of Weber Human Services that he had decreased auditory hallucinations such that they were "barely noticeable" and he had a "fairly good" mood. (See Tr. 154.) He continued to ride his bike and visit his mother during the day. (See Tr. 154.) Ms. Keane noted Plaintiff appeared to be "somewhat more relaxed." (See Tr. 154.)

On August 29, 2000, John H. Gill, Ph.D., a DDS psychologist, reviewed Plaintiff's file and opined he had undifferentiated schizophrenia and possible ongoing problems with substance abuse and had slight to moderate restrictions in activities of daily living and social functioning and seldom to often had deficiencies of concentration, persistence, and pace. (See Tr. 182, 184, 188, 189.) More specifically, Dr. Gill opined Plaintiff was "not significantly limited" to "moderately limited" in carrying out detailed instructions, maintaining attention and concentration for extended periods of time, performing activities within a schedule, maintaining regular attendance, being punctual within ordinary tolerance, and interacting appropriately with the general public; and "moderately limited" in completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of interruptions, and setting realistic goals or making plans independently of others. (See Tr. 192-93.) Dr. Gill considered Plaintiff capable of working. (See Tr. 194.)

On November 28, 2000, Dr. Swaner performed another psychological evaluation of Plaintiff for the DDS. (See Tr. 175-81.) Plaintiff rode a bus to within three blocks of Dr. Swaner's office and walked the rest of the way. (See. Tr. 175.) Plaintiff was appropriately dressed and groomed; and reported he had a driver's license, was independent in basic self-help skills, and completed his activities of daily living on a daily basis, such as preparing meals,

cleaning his apartment, and doing laundry. (See Tr. 176077.) He reported he occasionally visited his mother and had dinner with her, visited with two of his brothers every month; watched television "to a significant degree"; talked to neighbors; and was capable of maintaining a schedule if forced to do so. (See Tr. 178-79.) Dr. Swaner noted essentially similar findings as in August 2000. (See Tr. 176, 179-80.) He diagnosed schizophrenia, undifferentiated, with a GAF of 55. (See Tr. 180-181.)

On January 16, 2001, Margaret R. Moore, Ph.D., a DDS psychologist, reviewed Plaintiff's records and concurred with Dr. Gill's August 2000 opinions that despite some mild to moderate and moderate mental limitations, Plaintiff could work. (See Tr. 182, 194.)

Plaintiff testified at the August 23, 2001 administrative hearing that he could not work due to auditory hallucinations, dizziness, and an inability to concentrate. (See Tr. 40-41, 42, 43, 45-46.) He testified he had these symptoms for years, but worked anyway because it "was something [he] had to do." (See Tr. 41-42.) Plaintiff testified extensively as to the requirement of his past job as an upholsterer, an upholsterer's helper, and an electronics assembler. (See 35-40.) Plaintiff testified he had no problem sleeping. (See Tr. 44.) He also testified that he "always heard . . . voice[s] at some time or another" (See Tr. 48), but that medication calmed down the auditory hallucinations "considerably." (See Tr. 47.) Plaintiff testified he slept 12 hours per night, arose at 9:00AM, sometimes walked all day, watched very little television, fixed his meals, visited his mother, went to the library, and read daily; occasionally visited his brother; and visited with home teachers one Sunday per month. (See Tr. 49, 50, 51, 52.) He denied talking to neighbors, watching a lot of television, and ever using drugs or alcohol. (See Tr. 50, 51, 52.)

John F. Hurst testified as a vocational expert. (See Tr. 55-60-testimony; Tr. 73-74-professional qualifications.) He testified that Plaintiff's past work as an upholsterer's helper (DOT[10] #780.684-010) was unskilled, light work; as an upholsterer (DOT #780.381-018) was skilled, medium work; and as an electronics assembler (DOT #726.684-018) was semiskilled, light work. (See Tr. 56-57.) The ALJ asked Mr. Hurst whether an individual could work, who was the same age and had the same education and vocational history as Plaintiff; who had no physical limitations; and who had mild or moderate limitations in carrying out detailed job instructions, maintaining attention and concentration for extended periods of time, performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerance, interacting appropriately with the general public, setting realistic goals, and making plans independently of others. (See Tr. 57-58.) Mr. Hurst testified that this individual would be capable of performing jobs as an upholsterer's helper, an upholsterer, and an electronic assembler. (See Tr. 58.)

Mr. Hurst testified that if this individual had additional moderate limitations in understanding or remembering detailed instructions, working in coordination with or proximity to others without being distracted by them, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, and responding appropriately to changes in a routine work setting, he could still perform 30 percent of all upholsterer's helper and electronic assembler jobs. (See Tr. 58-59.) He specifically testified that 460,000 electronics assembler jobs and

---

[10]*Dictionary of Occupational Titles* (Fourth edition 1991), *available on* Law Desk, Social Security Excellence CD-ROM.

225,000 upholsterer's helper jobs would remain in the national economy. (See Tr. 59.) He testified that if the individual were markedly impaired in certain areas of mental functioning, it would rule out most jobs. (See Tr. 59-60.)

## DISCUSSION

To determine whether an individual suffers from a disability under the regulations, the ALJ must conduct a sequential five-step evaluation.[11]  The burden of proof lies with the plaintiff as to steps one through three; at steps four and five the burden shifts to the Commissioner.

In the first two steps, the ALJ determines whether the claimant has engaged in substantial gainful activity, and whether the claimant has a "severe" impairment.[14]  If the claimant has satisfied the first two requirements, the evaluation moves on to step three, a determination of whether the claimant's impairments meet or equal a disability described in the Listing of Impairments ("Listings").[15]  If the ALJ determines the claimant has an impairment that meets or equals the Listings, the ALJ must conclude the claimant is disabled.  If the claimant does not meet a Listing, the evaluation moves on to steps four and five during which an assessment is made of the claimant's residual functional capacity.[16]  At step four, it is determined whether the claimant can perform her past work.  If the claimant cannot, the evaluation moves to step five, where it is determined whether the claimant can perform other work.  The claimant must be

---

[11] See 20 C.F.R. § § 404.1520 (a) - (f).

[14] See 20 C.F.R. § 416.920(d).

[15] See 20 C.F.R. § § 416.920(d).

[16] See 20 C.F.R. § § 416.920(e) and 416.920(f).

found disabled if there is no work that the claimant can perform.[17]  On the other hand, if there is work which claimant can perform, and such work is available in significant numbers within the national economy, the claimant is not disabled and not eligible for benefits.[18]

### Step *THREE* Claim of Error

The Plaintiff argues that the Commissioner's regulations governing the evaluation of mental impairments require the use of a special technique. 20 C.F.R. § 404.1520a; 416.920a (2001). The regulations require the ALJ to rate the degree of functional limitation resulting from mental impairment. The four broad functional areas rated included: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 416.920a(c)(3). The degree of limitation in the first three areas is rated according to a five-point scale; None, mild, moderate, marked, and extreme. The fourth area uses a four point scale: None, one or two, three, four or more, counting the number of decompensation episodes. 416.920a(c)(4).

The regulations expressly require that the findings be made after consideration of a broad range of evidence:

> (2) At the administrative law judge hearing and Appeals Council levels, the written decision issued by the administrative law judge or Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must

---

[17] See 20 C.F.R. §  416.920(d).

[18] See 20 C.F.R. § 416.920(f).

include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.[19]

In the Commissioner's evaluation at step three, the ALJ identified Listing 12.03, *Schizophrenic, Paranoid and Other Psychotic Disorders* as the relevant listing. He found that the "A" criteria of that listing were met by "the continuous persistence of claimant's schizophrenia, and the blunt affect, flat affect, and incoherent or loosening of associations, of his thinking processes." R-16. However, he found Brown met only one of the two required "B" criteria for Listing 12.03, stating,

> The Administrative Law Judge's impression of the claimant's mental impairment derived from claimant's appearance at the hearing is that the claimant only has one marked limitation, that being his inability to maintain concentration, persistence or pace. The other restrictions are only mild to moderate.[20]

The ALJ did not provide the kind of detailed evaluation that the regulations require. By limiting the findings to an "impression" based on the "claimant's appearance at the hearing" the ALJ failed to rely on "the significant history, including examination"[21] in making the findings.

Further, rather than discussing the other criteria, he only said that "the other restrictions are only mild to moderate." This amalgamation further evidences the deficiency of these findings. By using the terms "mild to moderate" the ALJ failed to use the proper scale in rating Brown's limitation in the fourth broad area of functioning -- decompensation.[22] The regulations

---

[19] 20 C.F.R. § 416.920a.

[20] R-16.

[21] 20 C.F.R. § 416.920a.

[22] Decompensation is described in the introduction to the mental impairment listing as referring to "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace. 20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.00 C.4.

clearly require this rating to be numerical, counting the number of episodes -- none, one or two, three, four or more. The rating of "mild to moderate" is inappropriate for this area of functioning. The ALJ's failure to articulate findings in this area is a critical error, since the psychologist who examined Brown reported episodes of decompensation:

> Richard did complain to the examiner of some episodes of decompensation where he becomes quite non-functional. He reports that he sleeps for extended periods of time, he misses appointments and assignments. He reports that he has no real interest in most activities.

R-148.

In addition to this error, the ALJ failed to articulate his reasons for concluding that Brown has only "mild to moderate" limitation in activities of daily living and social functioning. This lack of articulation is significant because substantial evidence supports the conclusion that Brown has marked limitations in both of these areas.

### Activities of Daily Living

The record shows Brown has marked limitation in activities of daily living. His activities are limited to the following:

1. Visiting health care providers, R-45;

2. Watching TV for five minutes, walking and fixing lunch, R-49;

3. Walking around the library and reading for short periods of time, R-50;

4. Cleaning his apartment, although it is not completely clean R-51, 53; and

5. Riding a bicycle but no car driving, R-52.

Brown's mental health worker, Janet Burton, summarized Brown's limited daily activities as including: watching TV, walking, and preparing meals such as hot dogs. R-103-07. She noted

that Brown used to play pool but no longer does, because it is depressing. R-107. Dr. Swaner, the psychologist who examined him, recorded:

> Richard reports to the examiner that he does not complete much on a daily basis. He spends the majority of his time at home or out riding his bicycle. He does not appear to have a schedule, he does not appear to have any significant goals or expectations at this point in time.

R-147.

> In a subsequent report, Dr. Swaner recorded:
>
> Richard really does not do much from a productive point of view. He is currently living at the Marion Hotel, which is essentially a residence for underprivileged individuals. He reports that he does visit his mother on occasion and has dinner with her.
> He did report that he can take care of his apartment independently. He cooks small meals in the microwave. He reports that he can do his laundry. He is independent in domestic activities. [One] needs to remember that his apartment is a 1 room flat.

R-177.

These evidentiary facts are consistent with the ALJ's factual summary of Swaner's report that the "Claimant had no goals or expectations of himself or life in general.  He spent most of his day in his room or riding his bicycle."  R-15.   The evidence clearly demonstrates considerable limits on the claimant's daily activities.  The ALJ's conclusion, based on these facts, that the claimant has only "mild to moderate" impairment of activities of daily living is therefore puzzling.

## Social Functioning

The record also shows that Brown has limited social contact, consisting of occasional visits with his mother or brother. He testified he does not visit neighbors or friends, R-50; has no visitors at his apartment, with the exception of home teachers once a month, R-15. His brother

reported that Brown, "very rarely comes to family activities. When he does [he] usually gets along with others except [he] does not understand what others are talking about." R-93. Dr. Swaner, the psychologist who examined Brown, recorded:

> Richard reports to the examiner that he is not active socially at the time of this evaluation. He describes himself as being isolated and a loner. For a period of time he functioned primarily as a street person. He did live in the desert for several months attempting to raise his dogs. Apparently, he was forced into the desert because he did not have a kennel license to raise dogs in the city. He reports to the examiner that when he was in the desert he was hearing noises, he believed the wind was telling him stories, the rain was telling him stories, he was unsure as to rather [sic] or not he was suffering from cabin fever.
>
> ...
>
> Richard's social functioning can best be described as being aloof and withdrawn. He does not have a significant number of support systems available to him. He has limited contact with his nuclear family unit. He does attempt to assist his mother on occasion by mixing [sic] her dinner. In general he has very little social contact. He does not have a significant peer group within which to interact.

R-147-48.

> In a subsequent report, Dr. Swaner further recorded:
>
> Richard reports to the examiner that he does not have any significant hobbies. He reports that he does talk to people in the hotel, however believes that he is not close with them. Richard denied any significant peer group within which to interact.

R-178.

Again, the ALJ's abstract of Swaner's report was consistent with the above facts. "The claimant had no significant peer group with which he interacted, and had no support system." R-15. Yet, the ALJ's decision does not explain how he arrived at the conclusion that the claimant had only a mild to moderate limitation in social functioning.

The ALJ's failure to properly articulate findings at Step Three and to discuss their basis in the record requires a remand to the Commissioner.

Step *FOUR* Claim of Error

Plaintiff argues the ALJ erred in determining whether his impairments prevented him from performing any of his past relevant work. At step four, the regulations direct:

> If we cannot make a decision based on your current work activity or on medical facts alone, and you have a severe impairment(s), we then review your residual functional capacity and the physical and mental demands of the work you have done in the past. If you can still do this kind of work, we will find that you are not disabled.

20 C.F.R. 416.920(e). The Tenth Circuit has clarified the ALJ's duty at step four. In *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996), the Court noted that step four is comprised of three phases:

> 1. In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity (RFC);
> 2. In the second phase, the ALJ must determine the physical and mental demands of the claimant's past relevant work; and
> 3. In the third phase, the ALJ must determine whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one.

The court further held that "[a]t each of these phases, the ALJ must make specific findings." Id.

As already noted, the ALJ determined at step three that Brown had *marked* limitation in his ability to maintain concentration, persistence or pace. R-16. However, in his step four analysis, the ALJ found only *mild* limitation in Brown's ability to maintain attention and concentration for extended periods. R-19.[23] The vocational expert testified that if the hypothetical claimant had *marked* limitation in maintaining attention and concentration for

---

[23]The ALJ concluded Plaintiff had the RFC to perform the mental demands of work, limited by *mild* restrictions in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within ordinary tolerance, and interact appropriately with the general public and moderate restrictions in setting realistic goals and making plans independently of others. (See Tr. 17, 19 (Finding 7).)

extended periods, it would rule out performance of all of the claimant's past jobs. R-59-60.  The central nature of this factor at the step three and step four analysis requires remand.

The Commissioner argues that "a fair and reasonable reading of the ALJ's decision reflects his finding that, after 'reviewing all the evidence of record,' Plaintiff had mild restrictions in concentration, persistence, and pace." (Commissioner's Brief at 17, citing Tr. 17, 19 (Finding 7).)  The Government says the finding of a marked limitation in concentration, persistence and pace at step three is only an "inadvertent statement" – "at most, an arguable deficiency in decision writing that would be harmless error." (Commissioner's Brief at 17, citing Cf. *Glass v. Shalala*, 43 F.3d 1392, 1396-97 (10th Cir. 1994) (discussing ALJ's harmless error)).

However, that case – and the error considered – was very different than this one.  In *Glass,* there were two hearings, one where the claimant was unrepresented, at which the VE testified after claimant left the room, and another hearing at which the claimant was represented.  That claimant asserted on appeal that "the ALJ should have allowed her to cross-examine the vocational expert who testified in her absence at the first hearing."[24]  However, there was a clear waiver of any objection to that testimony on the record, by counsel, in the second hearing.[25]  And no objection was made on appeal to any of the findings resting on the VE's testimony.[26]  Finally, the appellate court concluded that there was no showing that cross-examination would have altered the VE's testimony.[27]

---

[24] Glass v. Shalala, 43 F.3d 1392, 1396 (10th Cir. 1994).

[25] *Id.*

[26] *Id.* at 1397.

[27] *Id.*

Glass's express acquiescence in a procedural error, failure to raise consequences of the error on appeal, and failure to demonstrate that the proper procedure would have created a different result all are different than the *inconsistency* in findings in this case and the *lack of articulation* of required findings and supporting evidence. The clear inconsistency of the ALJ's findings and failure to articulate an evidentiary basis for the analysis require remand.

## RECOMMENDATION AND NOTICE

The magistrate judge recommends that the case be remanded to the Commissioner for articulation of findings at step three and further analysis, if needed, consistent with the findings at step three.

Within 10 days after being served with a copy of this recommended disposition, a party may serve and file specific, written objections. A party may respond to another party's objections within 10 days after being served with a copy thereof. The rules provide that the district judge to whom the case is assigned shall make a *de novo* determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule. The district judge may accept, reject or modify the recommended decision, receive further evidence, or re-commit the matter to the magistrate judge with instructions.

DATED this 18th day of February, 2006.

BY THE COURT:

       s/David Nuffer
David Nuffer
United States Magistrate Judge